**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

XANTIPPLE CONERLY,

                  Plaintiff,

        v.

ROSWELL PARK CANCER INSTITUTE and
SUSAN PIKE, in her individual and professional
capacities,

                  Defendants.

Civil Case No.

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Xantipple Conerly ("Ms. Conerly"), by and through her undersigned counsel, as and for her Complaint in this action against Defendants Roswell Park Cancer Institute ("Roswell" or the "Institute") and Susan Pike ("Ms. Pike"), in her professional and individual capacity, (collectively "Defendants"), alleges as follows:

**NATURE OF THE CLAIMS**

1.   Accordingly, Plaintiff asserts claims against Defendants pursuant to 42 U.S.C. § 1981 ("Section 1981") and the New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq. ("NYSHRL").

**JURISDICTION AND VENUE**

2.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367(a).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

4. Ms. Conerly has and/or will file a charge of discrimination and retaliation in violation of Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), arising out of the facts described herein, with the Equal Employment Opportunity Commission ("EEOC").  When the EEOC issues Ms. Conerly's notice of right to sue, she will seek leave to amend this Complaint to add claims for Defendants' violations of Title VII.

5. Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

6. Plaintiff Xantipple Conerly is a resident and citizen of the State of New York. Ms. Conerly has been employed by Roswell from 2007 through the present.  At all relevant times, Ms. Conerly has been and is an "employee" of Roswell as that term is defined by the statutes at issue herein.

7. Defendant Roswell Park Cancer Institute is a public benefit corporation under N.Y. Pub. Auth. Law Section 3553.1(a), and is located in the City of Buffalo, New York and the County of Erie, N.Y.  At all relevant times, Roswell has been and is an "employer" of Ms. Conerly as that term is defined by the statutes at issue herein.

8. Upon information and belief, Defendant Susan Pike is a resident and citizen of the State of New York.  At all relevant times, Ms. Pike was employed by Roswell as an Operation Manager and directly supervised Ms. Conerly.  Ms. Pike actively and knowingly engaged in acts or omissions that aided or abetted discriminatory actions against Ms. Conerly.

**FACTUAL ALLEGATIONS**

9. There are very few black individuals in positions of power at Roswell.

10. Only two of the 14 members of the Board of Directors are black, and only two of the Institute's 22 Executives are black.

11. One of the two black Executives is the Head of Human Resources, a position that is often reserved for minorities, generally pays far less than other executive positions and is not generally afforded discretion in important decision making.

12. Roswell employs approximately three thousand five hundred (3,500) employees, of whom approximately three hundred (300) are Black.

13. Roswell employs approximately 300 physicians and scientists, including thirty (30) who are surgical oncology physicians. Since 2008 through the present, Roswell has employed just nine (9) Black physicians. Presently, only five (5) Black physicians are employed at Roswell. For years, the efforts of minority employees to boost diversity and ensure non-discriminatory hiring and promotion practices at Roswell have been undermined by the Institute's Executive team.

14. Upon information and belief, in or around 2008, the Office of Federal Contract Compliance Programs ("OFCCP") audited Roswell for potential compliance violations related to the lack of diversity at the Institute and its inadequate Affirmative Action Program ("AAP").

15. Upon information and belief, Roswell entered into a Conciliation Agreement with the OFCCP, promising to resolve these issues.

16. Upon information and belief, as part of its purported efforts to resolve these issues, Roswell hired Reggie Clark as its Director of Diversity.

17. Upon information and belief, including the letter attached hereto as Exhibit A, Mr. Clark encountered numerous barriers that prevented him from affecting any real change at Roswell, was discriminated against and ultimately resigned in 2010 because of his belief that Roswell was not committed to diversity.

18. Following Mr. Clark's resignation, he sent a letter to then-Chief Executive Officer Donald Trump. Ex. A. In this letter, Mr. Clark complained about "several conditions that hinder effective diversity and planning" and provided multiple examples, including inefficiencies in implementing Roswell's AAP, the Institution's refusal to provide Mr. Clark with the data necessary to ensure compliance with OFCCP and Equal Employment Opportunity ("EEO") requirements, discriminatory hiring and promotion practices and racist comments and conduct, among other issues.

19. According to Mr. Clark, he was told by Jennifer Barr, then the Senior Director of HR Management, that the Institution was cautious when deciding whether to actually review data because, once the data was actually reviewed, Roswell would have to actually do something to resolve racial disparities.

20. Mr. Clark also outlined numerous discriminatory acts committed by Vicki Garcia, who remains a Vice President of HR Management to this day. Mr. Clark also complained that Roswell's General Counsel, Michael Sexton, declared his proposed EEO/AA Recruitment Plan illegal and refused to implement it.

21. Clearly, Roswell's decision makers were not interested in actually resolving the systematic race discrimination at the Institute, which is reflected in the subsequent treatment of Ms. Conerly.

**Ms. Conerly is Subjected to Racial Discrimination By Susan Pike**

22. Ms. Conerly's claims of racial discrimination are related to her work under Defendant Pike, an Operation Manager at Roswell and Ms. Conerly's direct supervisor for several years.

23. Only two of Ms. Pike's direct reports are Black.

24. Ms. Conerly was subjected to blatantly racist comments by Ms. Pike, including, but not limited to:

- **"Every time I turn around, it looks as if all of the Black people are coming to your desk;"**

- **"I'll just go to the hood for a crack head;"**

- **"We can all act ghetto," referring to Black and Hispanic employees; and**

- **Using the word "chica" to refer to Hispanic employees.**

25. The regular use of racially discriminatory language and descriptions of Black and Hispanic employees permeated Ms. Pike's language and speech.

26. Further, throughout Ms. Conerly's employment, Ms. Pike's conduct demonstrates a racial animus against Black employees.

27. By way of example only, while Ms. Pike discouraged Ms. Conerly from writing-up non-Black employees she supervised, Ms. Pike routinely directed Ms. Conerly to issue written discipline to Black employees.

28. In addition, Ms. Pike more frequently instructed Ms. Conerly to monitor her Black employees for time and attendance issues and to listen to Black employee's calls to ensure that they were "using the correct verbiage."

29. At other times, Ms. Pike displayed her animus towards Black employees by refusing to even speak to them.

**RPCI's Deficient Response to Ms. Conerly's Complaints**

30. In August 2015, David Scott, Roswell's Director of Diversity and Inclusion, was put on notice of Ms. Conerly's complaints regarding Ms. Pike's racially discriminatory statements and conduct.

31. Ms. Conerly's complaints concerned Ms. Pike's response to a threat of violence made by another employee against Ms. Conerly, as well as Ms. Pike undermining Ms. Conerly's ability to supervise other employees.

32. Ms. Conerly explained that when she went to Ms. Pike regarding the threat of violence, Ms. Pike simply laughed at Ms. Conerly and refused to conduct any sort of investigation, let alone speak to the individual who allegedly made the threat.

33. Further, Ms. Conerly complained about Ms. Pike's active resistance to Ms. Conerly performing her position's supervisory functions, including discouraging Ms. Conerly from issuing written discipline to non-Black employees she supervised.

34. As a result of this complaint, Mr. Scott and Laura Porter, the president of Ms. Conerly's Union at the time, held a meeting with Ms. Conerly and Ms. Pike.

35. During this meeting, Mr. Scott informed Ms. Pike that her conduct was improper. He further explained what Ms. Pike should have done in response to Ms. Conerly's complaint and instructed Ms. Pike to permit Ms. Conerly to perform her supervisory duties without impediment.

36. Despite Mr. Scott's coaching, there was no change in Ms. Pike's behavior or attitude.

37. Moreover, Ms. Conerly's complaint resulted in swift and severe retaliation.

38. By way of example only, Ms. Conerly complained to Ms. Pike again regarding a second threat of violence and advised Ms. Pike that she had issued this employee a write-up.

39. When Ms. Conerly again sought Ms. Pike's assistance, Ms. Pike refused to take any remedial action.

40. Further, and by way of example only, Ms. Pike gave unsolicited instructions to Ms. Conerly's subordinates that they should reach out to Ms. Pike regarding any complaint against Ms. Conerly, no matter how trivial.

41. In addition, Ms. Pike required Ms. Conerly, but no other supervisors, to check with her before responding to emails from her subordinates.  If Ms. Pike was unavailable to confer on the response to a particular email, Ms. Conerly would provide the employee with a timely response, copying Ms. Pike on the email.  In an effort to undermine Ms. Conerly's supervisory status, Ms. Pike would often respond to Ms. Conerly's email with contradictory (and usually incorrect) information.

42. In August 2016, Ms. Conerly was forced to bring a second complaint regarding Ms. Pike to Mr. Scott's attention.

43. Two months later, Roswell changed Ms. Conerly's reporting structure and had her report to Brian Merritt, the Quality Assurance Manager.  However, this did not resolve the problem.

**Ms. Pike Continues Her Retaliatory Conduct Against Ms. Conerly**

44. After a brief medical leave of absence from in or around October 12, 2016 through in or around December 12, 2017, Ms. Conerly began her employment under the supervision of Mr. Merritt.

45.     Despite no longer being her supervisor, Ms. Pike continued to interfere with Ms. Conerly's work in retaliation for her complaints.

46.     As Mr. Merritt was new to Roswell, he often sought and followed the advice of Ms. Pike regarding his own job duties, including the supervision of Ms. Conerly.

47.     On or about December 13, 2016, the second day that Ms. Conerly was back at work after her medical leave of absence, three Black colleagues briefly approached her desk to welcome her back over the course of several hours.

48.     At the direction of Ms. Pike and Paula Celestino, Ms. Pike's supervisor, Mr. Merritt berated Ms. Conerly.  While wagging his finger in her face, Mr. Merritt admonished Ms. Conerly, saying, "Susan has been complaining about the people at your desk.  If I catch people at your desk, I will personally walk over and remove them."

49.     Shortly thereafter, Mr. Merritt significantly altered Ms. Conerly's work duties at the request of Ms. Pike.

50.     Prior to her medical leave of absence, Ms. Conerly was employed in a supervisory role where she, *inter alia*, ensured that proper staffing was in place each day, including making schedules for other employees; dealt with disputes and complaints from subordinate employees; trained subordinate employees on their job duties; and was working on creating standard operating procedures ("SOPs") for the call center.

51.     Mr. Merritt directed Ms. Conerly – but not other supervisors – to abandon all of her regular job duties in order to make phone calls to clients eight hours per day.

52.     After one month of making these phone calls all day, Ms. Conerly emailed Mr. Merritt and Ms. Pike and inquired to when she could resume her other job functions – including creating the SOPs that she had been specifically assigned to create by Brian Horsman in Human

8

Resources. After receiving no response to that email, Ms. Conerly sent a follow-up email, to which she also received no response.

53. Ms. Conerly had no choice but to approach Ms. Merritt directly and request a discussion about her job duties. Mr. Merritt bluntly retorted, "We are not taking about this. Get back to your desk and make your calls."

54. In or around March 2017, Ms. Conerly again sought to discuss her job duties with Mr. Merritt and understand why she, but not other supervisors, was forced to spend all day making calls. Once again, Mr. Merritt refused to discuss this with her and responded, "You are my employee. They are not." Mr. Merritt then instructed Ms. Conerly to continue making her phone calls.

55. On or about April 11, 2017, Ms. Conerly was informed by Mr. Merritt that she was being demoted from Supervisor/Team Leader to Associate.

56. In this new, lower position, Ms. Conerly not only lost all supervisory duties, but also was prohibited from providing advice to other employees, as well as had her administrative privileges and laptop revoked. Ms. Conerly's sole focus in this new position was telephonic customer service.

57. When Ms. Conerly asked Mr. Merritt why she was being demoted, he responded that Ms. Pike and Ms. Celestino had instructed him to demote her because of her complaints.

**Ms. Conerly Complains About Her Demotion**

58. Later that same day, Ms. Conerly scheduled a meeting with the Mr. Horsman and Mr. Scott.

59. During this meeting, Ms. Conerly was informed that Ms. Pike did not have the authority to demote her and that she had not actually been demoted. Mr. Horsman and Mr. Scott

9

told Ms. Conerly that Ms. Pike was instructed not to supervise Ms. Conerly, directly or through Mr. Merritt. Ms. Conerly was also informed that her administrative rights should be reinstated.

60. Approximately one to two days later, however, Ms. Conerly was approached by Darlene Drake, an employee in Ms. Conerly's department and a good friend of Ms. Pike. Ms. Drake, apparently speaking on behalf of Ms. Pike, advised Ms. Conerly that she should drop her complaints and simply continue making the phone calls that she was assigned.

61. In a blatant effort to silence Ms. Conerly, Ms. Drake described how Ms. Conerly had been "blacklisted" by Human Resources and described an on-going effort to "get rid of [Ms. Conerly]."

62. Ms. Drake advised Ms. Conerly that she should be thankful that she still had her job and that she had not been demoted or had her salary reduced.

63. Approximately two to three weeks later, Ms. Conerly had a follow-up meeting with Mr. Scott and Francine Bellanti, Ms. Conerly's union representative.

64. At this meeting, Ms. Conerly informed Mr. Scott of the retaliatory harassment she faced after her complaint. Mr. Scott denied that there was any effort terminate Ms. Conerly's employment and apologized for what had occurred.

65. Mr. Scott then stated that what had happened was "clear discrimination," and advised Ms. Conerly that if she wanted to file an EEOC charge, he would support her in that endeavor.

66. Despite these assurances, the terms of Ms. Conerly's employment remain changed.

67. To date, Ms. Conerly's administrative rights have not been reinstated, and her laptop has not been returned. Further, Ms. Conerly's subordinates are being told that they cannot speak with Ms. Conerly or approach her with questions because she is not, in fact, a supervisor.

68. Moreover, on or about June 5, 2017, Ms. Conerly was checking Roswell's I2 system and discovered that it no longer lists her as a Supervisor or Team Leader.

**Facts Relating to Roswell's Corporate Status**

69. Roswell is a public entity corporation as statutorily designated by N.Y. Pub. Auth. Law § 3553.1(a) ("There is hereby created a corporation to be known as the Roswell Park Cancer Institute Corporation which shall be a body corporate and politic constituting a public corporation."). *See* N.Y. Const. art. X, § 5.

70. As interpreted by New York courts, the phrase "body corporate and politic" refers to a wide variety of entities, and standing alone does not designate a public entity corporation as an alter ego or arm of the state.

71. Officers and employees of Roswell are "deemed public officers or public employees, as the case may be, in the [New York State] civil service," as set forth in N.Y. Pub. Auth. Law § 3557.1, and "entitled to all the rights thereto as if such employee was a state employee subject to the pertinent provisions of the civil service law." N.Y. Pub. Auth. Law § 3557.5.

72. Under New York General Construction Law ("N.Y. Gen. Constr. Law"), § 65(b), a "public corporation" is defined as either a "municipal corporation," a "district corporation" or a "public benefit corporation," but the Legislature has not defined Roswell as a "municipal corporation," which includes "a county, city, town, village and school district," *see* N.Y. Gen. Constr. Law § 66(2), or a "district corporation" which includes "any territorial division of the

11

state . . . whether or not such territorial division is expressly declared to be a body corporate and politic." § 66(3).

73. Roswell is self-funded and, with the exception of the appointment of Roswell's directors by the governor and other state officials, is not under significant state control.[1]

74. Importantly, New York is not liable for payment of any Roswell bonds or notes, *see* N.Y. Pub. Auth. Law § 3562, or budget deficits, and no New York statute indicates Roswell is structured in any other way than to be self-sustaining. N.Y. Pub. Auth. Law § 3554 (10)-(13). Nor does any provision of state law make the state responsible for debts or other liabilities, such as judgments or budget deficits, incurred by Roswell either directly or indirectly.[2]

**A Cancer Research Hospital is Not an Exclusive Function of the State**

75. Although Roswell is intended to benefit the people of the state of New York, its status as a public entity corporation does not, as a matter of federal law, designate it as an "alter ego" or "arm of the state" of New York for purposes of immunity.

76. The operation and management of a cancer research facility and hospital, such as Roswell, is not an exclusive function of state or local government. Nor is it traditionally a function performed by a state or local government. Roswell shares the field with hundreds of other private health and cancer research institutions that similarly receive funding through federal and state providers, including Medicaid or Medicare.

77. In the same way that private hospitals and cancer research companies operate, Roswell makes independent decisions about its employees, and admission and treatment of

---

[1] Elected NY officials appoint voting directors of Roswell and the governor appoints the chair of the board. N.Y. Pub. Auth. Law § 3553(1)(b), (3)(b).

[2] On an annual basis, Roswell must submit an annual reporting of its operations and quarterly reports of its fiscal condition certain state officials, including the comptroller. N.Y. Pub. Auth. Law § 3568(4)-(5).

patients.  It further executes its own contracts, leases and other agreements, and is served by its own separate legal counsel and department.  Roswell does not perform a unique government function that merits its exemption from the discrimination laws at issue in this action.  Like its counterparts in the private sector, Roswell must be held to the provisions of the laws in its entirety.

78. Although Roswell's directors and the chairperson of the board of directors are appointed by New York elected officials, their terms are defined for four to five years and once appointed, state lawmakers have no statutory right to oversight of board actions, Roswell's management, much less authority over day-to-day activities or planning and operations.

79. For purposes of the claims asserted by Ms. Conerly, Roswell is not a state agency and is not covered as an arm of the state under the particular statutes at issue.  Because New York is not responsible for judgments against Roswell, if punitive damages are awarded in this action, innocent taxpayers would not bear the costs.

80. The New York legislature can exempt Roswell from liability under 42 U.S.C. § 1981 at any time, yet it has not done so.

81. Having taken advantage of the benefits afforded to public entity status, Roswell is not entitled, absent express statutory authority, to take advantage of statutory exemptions intended to benefit entities offering essential services that traditionally fall under the auspices of the government.

### FIRST CAUSE OF ACTION
### (Discrimination in Violation of Section 1981)
### (*Against all Defendants*)

82. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

83. By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of Section 1981 by, *inter alia*, denying her the equal terms and conditions of employment because of her race and subjecting her to a hostile work environment because of her race.

84. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

85. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

86. As detailed *supra*, Roswell was not acting as an alter ego of the state of New York.

87. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)
### (*Against All Defendants*)

88. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

89. By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of Section 1981.

90. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

91. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

92. As detailed *supra*, Roswell was not acting as an alter ego of the state of New York.

93. Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
*Against Roswell*

94. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

95. By the actions detailed above, among others, Roswell has discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment because of her race and subjecting her to a hostile work environment.

96. As a direct and proximate result of Roswell's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

15

economic harm, for which she is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

97. As a direct and proximate result of Roswell's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

### FOURTH CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL)
*Against Roswell*

98. Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

99. By the actions detailed above, among others, Roswell has retaliated against Plaintiff based on her protected activities in violation of the NYSHRL.

100. As a direct and proximate result of Roswell's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

101. As a direct and proximate result of Roswell's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

### FIFTH CAUSE OF ACTION
### (Aiding and Abetting Unlawful Discrimination and Retaliation
### in Violation of the NYSHRL)
*Against Defendant Pike*

102. Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

103. By the actions described above, among others, Defendant Pike knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

104. As a direct and proximate result of Defendant Pike's unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress, for which she is entitled to an award of damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B. An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

    F.      An award of liquidated damages;

    G.      An award of punitive damages;

    H.      Prejudgment interest on all amounts due;

    I.      An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

    J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein

Dated: July 9, 2017
       New York, New York                    Respectfully submitted,

                                                  **WIGDOR LLP**

                                                   By: _____
                                                        Jeanne M. Christensen
                                                        Michael J. Willemin
                                                        Kenneth D. Sommer

                                                        85 Fifth Avenue
                                                        New York, NY 10003
                                                        Telephone: (212) 257-6800
                                                        jchristensen@wigdorlaw.com
                                                        mwillemin@wigdorlaw.com
                                                       ksommer@wigdorlaw.com

                                                        *Counsel for Plaintiff*